UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JESSICA LAUSELL,

                              Plaintiff,

         -v-                                                    CIVIL ACTION NO.: 19 Civ. 2016 (SLC)

                                                               **OPINION AND ORDER**
COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.

**SARAH L. CAVE**, United States Magistrate Judge:

## I.      INTRODUCTION

Plaintiff Jessica Lausell ("Lausell") commenced this action pursuant to Section 205(g) of

the Social Security Act (the "Act"), as amended, 42 U.S.C. § 405(g).  She seeks review of the

decision by the Commissioner (the "Commissioner") of the Social Security Administration

("SSA"), denying her application for Supplemental Security Income ("SSI") and Disability

Insurance Benefits ("DIB") under the Act.  Lausell contends that the decision of the Administrative

Law Judge dated May 9, 2018 (the "ALJ Decision") was erroneous and not supported by

substantial evidence, and that the ALJ was not properly appointed under Article II, Section 2,

Clause 2, of the United States Constitution (the "Appointments Clause").  Lausell asks the Court

to (a) reverse the Commissioner's decision for the calculation and award of benefits, or (b)

remand for a new hearing to reconsider the evidence.

The parties have cross-moved for judgment on the pleadings pursuant to Federal Rule of

Civil Procedure 12(c).  For the reasons set forth below, Lausell's motion (ECF No. 16) is GRANTED,

the Commissioner's motion (ECF No. 20) is DENIED, and the case is remanded to the agency for further administrative proceedings consistent with this Opinion and Order.

## II.    BACKGROUND

### A.    Procedural History

On August 26, 2015, Lausell filed an application for DIB[1] and SSI benefits,[2] alleging that she had been unable to work since January 1, 2015.  (SSA Administrative Record ("R.") 193–207 (ECF No. 15)).  On October 14, 2015, the SSA denied Lausell's application, finding that she was not disabled.  (R. 79, 92).  On November 12, 2015, Lausell filed a written request for a hearing before an ALJ.  (R. 113).  On November 14, 2017, she appeared before ALJ George Michael Gaffaney for an evidentiary hearing.  (R. 33).  On May 9, 2018, ALJ Gaffaney issued the Decision, finding that Lausell was not disabled under the Act.  (R. 28).  On January 10, 2019 the SSA Appeals Council denied Lausell's request for review.  (R. 1–5).

On March 4, 2019, Lausell filed her complaint in this Court (the "Complaint").  (ECF No. 2). Lausell argues that ALJ Gaffaney failed to appropriately weigh the medical evidence, failed to properly evaluate her subjective allegations, and was not properly appointed pursuant to the Appointments Clause. (ECF No. 17).

---

[1] In order to quality for DIB, a claimant must be both disabled and insured for benefits.  42 U.S.C. § 423(a)(1)(A); 20 C.F.R. §§ 404.120, 404.315(a).  The last date a person meets the insurance requirement is the date by which the claimant must establish a disability.  Lausell met the insurance requirements through December 31, 2016, and thus her disability must have begun on or before that date to quality for DIB.  (R. 13).

[2] SSI, unlike DIB, has no requirement of being insured for benefits, but requires a showing of financial need.  20 C.F.R. § 416.202. The definition of disability is the same for both DIB and SSI, but the onset date for SSI is the date the claimant filed an application for benefits, and the benefits are limited to that date forward.

**B.**     **Factual Background**

**1.**     **Non-medical Evidence**

Lausell was born in June 1978 and is currently 42 years old.  (R. 193).  She lives with her four children, who were between eight and nineteen years old at the time of the hearing. (R. 37).

Since 2009, Lausell has used a wheeled chair to perform her daily tasks, and she cooks, sweeps, mops, and washes dishes while seated in the chair.  (R. 40–41).  Lausell testified that she can remain seated for "[a]bout 30 minutes," and alternates between sitting and standing up for tasks that take longer than 30 minutes.  (R. 41).  Lausell testified that she uses a cane "all the time," which she holds in her dominant, right hand.  (R. 37–38, 60).  Notwithstanding these limitations, Lausell is able to manage her personal hygiene.  (R. 54).

Lausell had a gastric sleeve operation in early 2015 because she was, in her words, "extremely obese" and "felt close to death."  (R. 38–39, 365).  She lost over 100 pounds following the surgery, and weighed 245 pounds when she testified in this action in 2017.  (R. 365, 37).

From 2009 through 2014, Lausell worked in beauty salons cleaning, sweeping and mopping and stocking shelves.  (R. 229).  She also cleaned apartments for four regular customers.  (Id.)  Lausell has not worked since 2014, and supports herself with public assistance including food stamps.  (R. 38, 57).

Lausell described that she had an "extremely rough childhood and [experienced] very traumatic events," as a result of which she "constantly" has intrusive thoughts and feelings of depression and anxiety.  (R. 43).  Lausell testified that these symptoms affected her parenting and caused her to be too anxious to accompany her 14-year-old son to school multiple times each week. (R. 43–44).  Her social life is limited to interactions with her children, her sister, who

lives in upstate New York, and medical practitioners.  (R. 52).  Her anxiety causes her generally to avoid public transportation.  (R. 44–45).  She leaves her apartment to shop once per month. (R. 335).

### 2. Medical evidence

#### a. Dr. Yossef Blum

Dr. Yossef Blum, an orthopedic surgeon, treated Lausell extensively from at least May 2015 through November 2017.  (See R. 275, 793).

On May 22, 2015, Dr. Blum provided a general orthopedic physical examination.  (R. 275). Lausell reported that she experienced pain in both knees, severe on the right side and moderate on the left side that was not significantly improved by NSAIDs, and that she could walk only two blocks, assisted with a cane.  (Id.)  Dr. Blum examined the bilateral knees and documented pain and crepitus with range of motion bilaterally.  (R. 276).  Lausell's range of motion was painless in both hips.  (Id.)  Dr. Blum diagnosed Lausell with severe bilateral knee degenerative joint disease, which was more symptomatic on the right side.  (Id.)

Dr. Blum "had a long discussion with [Lausell] concerning the risks, benefits and nonsurgical alternatives of right total knee replacement[,]"and assessed that nonoperative treatment including medications, injections and use of an "assistive device" had not helped enough.  (R. 276).

On May 28, 2015, Lausell underwent a pre-surgical physical examination, and was admitted to Montefiore Medical Center from June 1, 2015 until June 3, 2015 for a total right knee arthroplasty ("TKA").  (R. 270–74, 264).  Dr. Blum performed the surgery on June 1, 2015, which was indicated "because of the fact that [Lausell] had very significant pain, significant functional

impairment, and significant arthritic changes on x-ray." (R. 296).  The Discharge Summary, signed by Dr. Sandeep K. Ponnappan, PA, indicates that Lausell had presented with "painful and decreased [range of motion,]" but tolerated the procedure well, was admitted for post-operative physical and occupational therapy, and was ultimately deemed stable for discharge.  (R. 267). Among the secondary diagnoses indicated were morbid obesity and osteoarthritis of the bilateral knees and hips.  (R. 268).  While admitted to the hospital, on June 2, 2015, Lausell had an initial evaluation with Donnie Chan, DPT, who noted in the social history that Lausell used a "standard cane" as an assistive device, had difficulty with her activities of daily living, and was limited to ambulating "up to 1 block with SC," that is, a "standard cane," identified in the same category of the report.  (R. 294).

On December 23, 2015, Dr. Blum evaluated Lausell in a six-month post-surgical follow-up appointment.  (See R. 344).  Lausell reported no complaints for her right knee but complained of severe left knee pain and bilateral hip pain, and reported that she could "[w]alk a few blocks, unassisted, limited by left knee."  (Id.)  A physical examination revealed the right knee was well-healed with a painless range of motion to the right knee.  (Id.)  Conversely, the left knee had pain and crepitance with range of motion on the left side.  (Id.)

An x-ray of Lausell's pelvis revealed "no evidence of significant arthritic change, fracture or other pathology on either side."  (R. 348).  Dr. Blum noted painless range of motion of both hips without trochanteric tenderness and that Lausell's lumbar spine was not tender.  (R. 344). In Dr. Blum's assessment and plan he noted that Lausell was "doing well" following the right total knee arthroplasty but had "severe" left knee degenerative joint disorder as well as bilateral hip trochanteric bursitis, "more significantly symptomatic on the left side."  (R. 348).

Dr. Blum treated Lausell with 40 milligram methylprednisolone acetate injections to the left knee and the greater trochanteric bursa of the left hip.  (R. 347).  Dr. Blum also discussed the course of knee osteoarthritis and treatment with Lausell, discussed weight loss and activity modification, "as well as the role of bracing and assistive devices (such as a cane or walker)."  (R. 348).  Dr. Blum noted in the assessment and plan that Lausell was considering undergoing a left TKA.  (Id.)

On March 10, 2016 Lausell followed up with Dr. Blum, for continuing "severe" pain in her left knee.  (R. 356).  Lausell reported that the last injection provided relief for only about two months.  (Id.)  A physical examination revealed unchanged range of motion, stability and alignment, with pain and crepitance with range of motion bilaterally.  (Id.)  Dr. Blum treated Lausell with a 40 milligram cortisone injection to her left knee, which she tolerated well, and referred her to a pain management doctor to evaluate and treat her lower back pain.  (R. 359).  Dr. Blum noted that Lausell was contemplating undergoing a left TKA in the fall, and he directed a follow up appointment in three months.  (Id.)

On June 9, 2016 Lausell followed up against with Dr. Blum concerning her knee and hip pain.  (See R. 360).  Lausell reported severe left knee pain located diffusely throughout the left knee unmitigated by NSAIDs, as well as left hip pain extending into the left buttock and lumbar region.  (Id.)  Dr. Blum examined the right knee revealing a range of motion 0–120 degrees; the left knee again had unchanged range of motion and pain and crepitance with range of motion.  (R. 360–61).  Dr. Blum documented that Lausell "[h]as advanced left knee DJD [degenerative joint disease]" as well as left lateral hip and buttock and lumbar pain.  (R. 363).  Dr. Blum posited that "there is a strong component of lumbar pathology[,]" and referred Lausell to a spine specialist

for further evaluation.  (R. 363–64).  Lausell "specifically request[ed] a left TKA[,]" and Dr. Blum

had a "long discussion" with her concerning the fact that she:

> has significant symptoms (especially pain) and functional limitations [and] [n]onoperative interventions have not been helping enough.  I discussed the option of a left total knee replacement.  I believe that the patient is indicated for surgery due to the severity of pain/symptoms, functional impairment, and radiographic appearance of knee arthritis.

(R. 364).

Lausell followed up with Dr. Blum on September 29, 2016, complaining again of severe

left knee pain not improved by NSAIDs.  (R. 368–69).  Lausell did not complain of hip pain, right

knee pain or back pain.  (R. 368).  Dr. Blum again treated Lausell with a 40 milligram cortisone

shot to the left knee and x-rayed the bilateral knees.  (R. 372).  The right knee appeared without

evidence of fractures, loosening of components, degeneration or wear, while the x-ray revealed

advanced left knee degenerative joint disorder.  (Id.)

Dr. Blum's assessment and plan noted that Lausell's left knee was "very symptomatic,"

and he again had a "long discussion" with her concerning her "significant symptoms" and

functional limitations and his continuing view that non-operative interventions had not been

helping enough such that Lausell required a left total knee replacement.  (R. 372–73).  In January

2017, Lausell requested a left TKA.  (R. 373).

Lausell next followed up with Dr. Blum on July 27, 2017.  (R. 756).  Lausell had no

complaints concerning her right knee, but again complained of "severe" left knee pain which

limited her to walking a few blocks unassisted, and prevented her from squatting on the left side.

(Id.)  Dr. Blum's examination of the left knee was unchanged as to range of motion, stability and

alignment, but there was pain and crepitance with range of motion on the left side.  (Id.)  Dr.

Blum observed there was a painless range of motion of both hips, no trochanteric tenderness and the lumbar spine was nontender.  (Id.)  Dr. Blum again treated Lausell with a 40 milligram cortisone injection to the left knee, and noted again in the assessment and plan that she had advanced left knee degenerative joint disorder.  (R. 760).  Dr. Blum again discussed the role of bracing and assistive devices, such as a cane or walker and discussed Lausell's plans to have a left TKA surgery.  (Id.)  Lausell shared that she previously cancelled the surgery twice but planned to go forward with it.  (Id.)

The last documented follow up with Dr. Blum occurred on November 6, 2017.  (R. 793).  Lausell complained of bilateral knee pain, severe on the left side and mild on the right side; she did not complain of hip or back pain.  (R. 794).  Examination of the left knee was unchanged as to range of motion, stability and alignment, with pain and crepitance with range of motion.  (Id.)  Lausell had painless range of motion to both hips and no trochanteric tenderness.  (R. 794).  Dr. Blum again treated Lausell with a 40 milligram cortisone and documented that her advanced left knee degenerative joint disease was very symptomatic.  (R. 799).  Lausell again discussed a left knee TKA but reported that "right now, based on her family situation, she is not ready for it."  (R. 800).

### b.  Paul Levin, MD

On August 26, 2016, Dr. Levin provided an examination and evaluation primarily focused on Lausell's back and hips.  (R. 364).  Lausell reported experiencing three months of severe pain to the lower back that was constant and present daily as well as pain and burning to the left lateral hip when lying on her left side and a severe pain when she stands up from a lying or seated position for "a while."  (Id.)  Dr. Levin performed a physical examination and observed that Lausell

did not limp, was "minus few degrees of full extension" to the left knee, had moderate left trochanteric tenderness and a slightly internally rotated left lower extremity when walking. (R. 365).  Dr. Levin also evaluated a 2011 MRI report of Lausell's lumbar spine which indicated a "L4-L5 disc bulge thecal sac impingement [and] [l]evocurvature." (Id.)  Dr. Levin diagnosed Lausell with lumbago (pain in the lower back) and greater trochanteric bursitis of the left hip.[3]  (Id.)  Dr. Levin discussed an exercise regimen with Lausell, directed her to use ice or heat and Tylenol for pain and directed her to follow up as necessary.  (R. 365, 582).

### c.   Soo Yeon Kim MD

On December 27, 2016, Lausell had an initial evaluation with Dr. Soo Yeon Kim, MD for lower back pain.  (R. 379).  At the appointment, Lausell reported sharp and constant pain rated at a 6/10 that is "aggravated with prolonged standing, walking, climbing up/down stairs[,]" and that limited her ambulation to one block.  (Id.)  Lausell also reported that the pain was functionally and emotionally disabling, and hindered her ability to go about the activities of daily living such as routine housework.  (Id.)  Lausell noted that she had not had a course of physical therapy, did not have numbness or weakness, and was treated with tramadol, which provided temporary pain relief, lasting roughly one hour.  (Id.)

Dr. Kim performed a physical exam which included an examination of Lausell's back, hips and lumbar area, as a result of which Dr. Kim determined that her symptoms are likely due to arthropathy (a joint disease) of the sacroiliac joint, which connects the pelvis and lower spine,[4]

---

[3] Trochanteric bursitis is an inflammation to the bursa sacs, which are "small pouches filled with a thick fluid . . . meant to lubricate joints and protect body parts from friction." What is Trochanteric Bursitis, WebMD, https://www.webmd.com/pain-management/trochanteric-bursitis (last visited Feb. 23, 2021).

[4]      Sacroiliac      joints,      MayoClinic.org,      https://www.mayoclinic.org/diseases-conditions/sacroiliitis/multimedia/sacroiliac-joints/img-20005962 (last visited Feb. 23, 2021).

and which involved significant myofascial pain.  (R. 382).  Dr. Kim recommended that Lausell continue to take tramadol for pain as well as interventions including steroids to the sacroiliac joint under fluoroscopic guidance, physical therapy including, specifically, AposTherapy,[5] and also recommended weight loss to reduce chronic pain.  (R. 383).

On July 25, 2017, Dr. Kim and Dr. Adeepa Singh MD, a medical resident, jointly evaluated Lausell.  (R. 738, 746).  Lausell reported pain of 8/10 in the left buttock lasting several months, always present and worse with ambulation, although responsive to tramadol.  (R. 739).  Dr. Singh diagnosed Lausell with sacroiliac joint dysfunction of the left side.  (R. 748).  Lausell did not follow through with the sacroiliac joint injection because she felt anxious and depressed but she reported that she would like to go through with it because her significant pain interfered with her life.  (R. 739).  Drs. Kim and Singh planned a left sacroiliac joint injection.  (R. 746).

### d.  Other Physical Medical Evidence

On February 19, 2016, Lausell sought treatment from Dr. Alexander P. Diaz de Villalvilla, MD for complaints including worsening two-to-three daily episodes of "spinning" sensations "happening when changing position (getting up, turning direction, bending over)."  (R. 349).  Dr. Diaz de Villalvilla reviewed Lausell's MRI, which was routine without contrast, and assessed Lausell for central vestibular vertigo, left.  (R. 351).  Dr. Diaz de Villalvilla noted Lausell had "slight LUE dysmetria and falls a little to her R[ight] with tandem gait yet neg[ative] Romberg[,]" and referred her to an ENT.  (Id.)

---

[5] "AposTherapy uses a biomechanical shoe-like device . . . calibrated by [a] physical therapist to offload pressure from painful joints . . . [to] help retrain muscles in [the] knees, hips and lower back." AposTherapy Treatment at Montefiore, https://www.montefiore.org/apos (last visited Feb. 23, 2021).

On May 18, 2017, Lausell had an annual physical examination with Dr. Jamie Osman-Wager, MD.  (R. 429).  Lausell presented reporting persisting left sided tinnitus and dizziness and balance changes, occurring occasionally when getting up from sitting or lying down, burning pain throughout her back, and lower lumbar pain.  (R. 430).  Lausell reported that she used a cane at home and that her knee pain was fairly controlled with tramadol. (R. 435).  In a mental health questionnaire, Lausell reported feeling depressed or hopeless and lacking interest or pleasure nearly every day.  (R. 433).  Dr. Osman-Wager diagnosed her with sacroiliac joint dysfunction of both sides, lumbago, central vestibular vertigo, tinnitus, generalized anxiety disorder, panic disorder and major depressive disorder.  (R. 434–35).  Dr. Osman-Wagner discussed with Lausell a possible epidural injection to the sacroiliac joint and referred her to an ENT concerning her left sided tinnitus and dizziness.  (R. 435).

On September 29, 2017, Lausell was seen by Audiologist Evan Hirschhorn and Dr. Marc Gibber, MD for a hearing evaluation following her reports of dizziness and imbalance and a "swishing in [the] left ear."  (R. 775).  The doctors documented mild hearing loss, diagnosed Lausell with tinnitus to the left ear and noted that Lausell was "highly suspicious" for Meniere's disease. (R. 774–75, 780).[6]

### e.  Sacha Zilkha, MA

On February 26, 2016, Sacha Zilkha, MA provided Lausell a psychiatric evaluation and drafted a treatment plan.  (R. 820).  Ms. Zilkha diagnosed Lausell with posttraumatic stress

---

[6] "Meniere's disease is an inner-ear condition that can cause vertigo . . .[i]t also can cause ringing in [the] ear (tinnitus), hearing loss that comes and goes, and a feeling of fullness or pressure in [the] ear.  Usually, only one ear is affected."  Meniere's Disease, WebMD, https://www.webmd.com/brain/what-is-meniere-disease (visited Feb. 24, 2021).

disorder and persistent depressive disorder with anxious distress and persistent major depressive episodes.  (R. 821).  Ms. Zilka recommended weekly cognitive behavioral therapy and monthly medication management to address these conditions.  (R. 821–22).  In the treatment plan, Ms. Zilka indicated that Lausell "has been actively engaged in treatment" and "would like to resume activities that she enjoys, such as cooking, caring for her physical appearance, writing, and dancing."  (R. 822).  Zilka's treatment summary noted that although Lausell has started to demonstrate an improved mood, she continues to need support in "maintaining good mood, challenging cognitive distortions, behavioral activation and linking thoughts and feelings[,]" and experienced "emotional dysregulation" as a result of her posttraumatic stress.  (R. 823).

### f.   Dr. Shahab Motamedinia, PhD

On November 24, 2017, Dr. Motamedinia evaluated Lausell and set forth a psychiatric treatment plan.  (R. 825).  Dr. Motamedinia diagnosed Lausell with posttraumatic stress disorder, persistent anxiety disorder, generalized anxiety disorder and tobacco use disorder, and ordered bimonthly cognitive behavioral and psychodynamic therapy, as well as monthly medication management.  (R. 827–28).  Dr. Motamedinia's treatment summary indicated that Lausell's mood and motivation have improved although she continues to struggle with depressed mood and anxiety symptoms related to past trauma.  (R. 830).

### g.   September 2015 Consulting Examination by Dr. Carol McLean Long

On September 17, 2015, Dr. Carol McLean Long, M.D. examined Lausell and provided an internal medicine examination.  (See R. 326).  Lausell reported being diagnosed with arthritis in both knees in 2006, having bariatric surgery and a total right knee replacement in 2015, beginning to use a cane following surgery, and experiencing progressively worse knee pain to the left knee.

(R. 326–27).  Lausell reported that she is only able to walk one-to-two blocks and must stand after sitting about 20 minutes.  (Id.)

Dr. Long observed that Lausell "has a cane which appears to be medically necessary." (R. 328).  Dr. Long noted that Lausell walks with a limp both with the cane and without the cane, although the limp decreases with the cane.  (Id.)  Lausell could rise from a chair without difficulty although she had difficulty walking on heels and toes and squatted "1/4 of full."  (Id.)

Dr. Long performed a musculoskeletal examination and determined that Lausell's joints were stable and non-tender, without redness, heat, swelling, or effusion.  (R. 329).  Lausell's cervical spine showed full flexion and extension, her lumbar spine showed extension to 45 degrees, her hips had flexion and extension to 70–80 degrees bilaterally and her knees had flexion and extension to approximately 110 degrees bilaterally.  (Id.)  Lausell indicated that she "did not want her knees touched" and strength of the bilateral lower extremities was indicated as 4/5.  (Id.)

As relevant to this action, Dr. Long diagnosed Lausell with: history of arthritis in both knees, status post total right knee replacement, history of bariatric surgery for weight loss and a history of posttraumatic stress disorder and anxiety.  (R. 329).  Dr. Long deemed Lausell's prognosis to be "fair" and determined from her examination that "there is mild limitation in the claimant's ability to sit, stand, climb, walk, push, pull, or carry heavy objects."  (Id.)  Dr. Long deferred to psychiatry regarding Lausell's psychiatric limitations.  (R. 330).

### h.  September 2015 Psychiatric Consultation by Dr. Nancy Cope

On September 17, 2015, Nancy Cope, Ph.D. performed a psychiatric evaluation of Lausell. (R. 332).  Dr. Cope determined that Lausell's evaluation appeared consistent with psychiatric

problems and "may significantly interfere with [her] ability to function on a daily basis."  (R. 335).

Dr. Cope diagnosed Lausell with major depressive disorder, recurrent episodes; panic disorder,

and posttraumatic stress disorder, with a "fair" prognosis.  (R. 335–36).

Lausell reported that she had weekly psychotherapy appointments with a therapist since

2013, and monthly medication management sessions with a psychiatrist since 2014, both

affiliated with Montefiore Hospital.  (R. 332). Lausell noted that she lost over 100 pounds in the

eight months following her bariatric surgery, and provided symptoms of depression and anxiety,

including dysmorphic moods, feelings of hopelessness, concentration difficulties, social

withdrawal, excessive worry, and panic attacks occurring three times per week.  (R. 333).  Lausell

denied recent suicidality, thought disorder and manic symptomatology but reported short term

memory deficits and difficulty in concentration, learning new materials and organization.  (Id.)

Dr. Cope documented that Lausell used a cane, and Lausell reported that she has difficulty

bending and uses a wheeled computer chair when cleaning.  (R. 334–35).  In a mental status

examination, Dr. Cope deemed Lausell's thought processes to be coherent and goal directed, and

she was oriented to person and place but not time.  (R. 334).  Lausell's affect was depressed, her

attention and concentration were mildly impaired, and her recent and remote memory skills

were impaired, while her insight and judgment were good and cognitive functioning was average.

(R. 334).  Dr. Cope determined that Lausell was moderately limited in her ability to deal

appropriately with stress, although there was no limitation in her ability to perform simple tasks

independently or to maintain a regular schedule and mild limitations in her ability to maintain

attention and concentration.  (R. 335).

### i.  October 2015 Agency Examiner K. Lieber-Diaz PsyD

On October 14, 2015, K. Lieber-Diaz, PsyD assessed Lausell's medical record and determined that she had mild limitations to her activities in daily living and in maintaining social functioning and moderate difficulties in maintaining concentration, persistence and pace. (R. 72).[7]  Dr. Lieber-Diaz determined that one or more of Lausell's medically determinable impairments may reasonably be expected to produce pain or other symptoms but found that Lausell's statements about the intensity, persistence and functionally limiting effects of the symptoms was not substantiated by objective medical evidence alone.  (R. 72–73).  Dr. Lieber-Diaz opined that Lausell was capable of "simple work on a sustained basis."  (R. 77).

### j.  December 2015 Assessment by Dr. Jacque Beauvais

On December 17, 2015, Dr. Jacque Beauvais completed a two-page form assessing Lausell's impairments and physical limitations.  (R. 340–41).  Dr. Beauvais, an internal medicine doctor, diagnosed Lausell with obesity and osteoarthritis, and noted that "standing/walking" are affected by the impairment, as a result of which Lausell can "stand and/or walk" for one hour, total, in an eight-hour work day.  (R. 341).  In a series of check-box questionnaires, Dr. Beauvais indicated that Lausell could never lift any weight over five pounds, could frequently lift 0–5 pounds, and could either frequently, or constantly perform manipulative activities involving reaching, feeling or pulling.  (R. 340–41).  Dr. Beauvais also indicated that Lausell could never kneel or crawl, could occasionally bend, balance or crouch, and could frequently climb or stoop. (R. 340).

---

[7] State agency examiners examine the record, not the claimant, and make a determination based upon a review of the file, including any available medical opinions.  See Rivera v. Commissioner, No. 19 Civ. 4630 (LJL) (BCM), 2020 WL 8167136 at *4 n. 7 (S.D.N.Y. Dec. 30, 2020).

Dr. Beauvais' form includes five sections calling for him to "include the medical / clinical findings that support this assessment" or "include the medical findings to support this assessment."  (R. 340–41).  These are all blank, and notably, his signature is atop a signature block on which Dr. Villalvilla was the listed physician, and Dr. Villalvilla's name has been crossed out with Dr. Beauvais' name written-in.  (Id.)

C.    **Administrative Proceedings**

1.    **Hearing before ALJ Gaffaney**

On November 14, 2017, ALJ Gaffaney held a hearing at which Lausell was represented by counsel, William Aronin ("Aronin").  (R. 33).  The proceeding was conducted by video, with Lausell and Aronin appearing in-person in New York City and ALJ Gaffaney in Chicago, Illinois.  (R. 35).

At the start of the hearing Aronin advised that all of Lausell's medical treatment was at Montefiore, and that her psychiatric records were not included in the records produced.  (R. 36). ALJ Gaffaney allowed two weeks for these records and advised Aronin that, "[i]f you need additional time, let me know and we'll take a look at it at that point."  (R. 36–37, 63–64).

ALJ Gaffaney observed on the record that Lausell had a cane and asked whether she "use[d] it all the time," to which Lausell testified, "yes."  (R. 37–38).  Lausell testified later, in response to questioning by her attorney, that she holds the cane with her right hand.  (R. 60, 37). ALJ Gaffaney inquired what kept Lausell from working, and she listed:  (i) arthritis in both knees; (ii) bursitis of the left hip; (iii) sacroiliac joint dysfunction; (iv) irritable bowel syndrome (IBS) and acid reflux; (v) anxiety, depression and post-traumatic stress disorder (PTSD); and (vi) Meniere's disease.  (R. 38).

Lausell testified that since 2009, she has used wheeled chair to perform her daily tasks, and explained that she can remain seated for "[a]bout 30 minutes" and alternates between sitting and standing up for tasks that take longer than 30 minutes. (R. 40–41). When she remains seated for longer than 30 minutes her legs and knees become stiff, and she described experiencing pain if she remained standing. (R. 41–42). Lausell also described feeling pain to the left hip and lower back while lying in bed caused by hip bursitis and sacroiliac joint dysfunction. (R. 42–43).

Next, Lausell testified about the impact of her psychiatric conditions on her ability to work. Lausell described that she had an "extremely rough childhood and [experienced] very traumatic events," as a result of which she "constantly" has intrusive thoughts and feelings of depression and anxiety. (R. 43). Lausell testified that these symptoms affected her parenting and caused her to be too anxious to accompany her 14-year-old son to school. (R. 43–44). Lausell described that she did not have a social life, and the only people she interacts with are her children, her doctor and therapist, and her sister, who lives in upstate New York. (R. 52). With respect to transportation, Lausell testified that anxiety caused her generally to avoid public transportation. (R. 44–45).

On follow-up questioning by ALJ Gaffaney, Lausell elaborated on her physical symptoms and course of treatment. Lausell described a "really strong throbbing and [] constant[] clicking" to the right knee, which she experienced all day, every day. (R. 47–48). Lausell also testified that she experienced stinging and burning pain sensations to her lower back, for which she received treatment by Dr. Soo Kim. (R. 47). Lausell testified that her pain-management regimen included physical therapy exercises "here and there," cortisone shots, and medications including

Naproxen (a nonsteroidal anti-inflammatory drug), Flexeril (a muscle relaxer) and Gabapentin (for pain).  (R. 48–50, 435).  Lausell also mentioned past medication therapy with Tramadol and Motrin.  (R. 49).  According to Lausell, the medications did not provide any more than fleeting improvement to her pain.  (R. 50–51).

Lausell testified that she previously worked part time at a nail salon and spa, tidying up and providing manicures and pedicures, as well as cleaning apartments on the side.  (R. 56–57). Lausell last worked in 2014.  (R. 57).  ALJ Gaffaney determined at the hearing that this work did not constitute substantial gainful activity.  (R. 58).

Following Lausell's testimony, Lisa Gagliano ("Gagliano") testified as a Vocational Expert. (R. 55–56).  ALJ Gaffaney asked Gagliano to consider a hypothetical individual who was 39 years old, 36 at the disability onset date, with a limited education, and no past relevant work, who was limited to lifting twenty pounds occasionally and ten frequently, and who could "stand two hours . . . in an eight-hour workday; sit for six."  (R. 58).  The hypothetical limited non-exertional activities to occasional stairs, stooping and balancing, and never any kneeling, crouching, crawling or ladders.  (Id.)  The hypothetical limited work to "simple routine tasks with occasional change in a routine work setting and just occasional interaction with the public."  (R. 58–59).

Gagliano testified that this hypothetical individual would be able to find "some sedentary work" despite these limitations, including as a "final assembler" (DOT 713.687-018), an unskilled occupation with an SVP of two, of which there are approximately 21,000 jobs nationally, a "visual inspector" also known as a "touch-up screener" (DOT 726.684-110), a sedentary position with an SVP of two with approximately 17,000 jobs existing nationally, or as a "sorter" (DOT 521.687-068) an unskilled position with an SVP of two of which there are approximately 10,000 positions

nationally.  (R. 59).  These positions each permit a "sit/stand" option while working at a bench or stool.  (Id.)  However, Gagliano testified that it would be preclusive if this hypothetical individual were required to miss two days of work per month.  (Id.)

Aronin posed a follow-up hypothetical to Gagliano adding the limitation that the individual needed to hold a cane with their dominant hand while standing.  (R. 60).  Gagliano testified that there would be no available positions.  (Id.)  Conversely, Gagliano testified that "[i]f the cane is only needed to ambulate, those jobs would still be available."  (R. 60–61).  In sum, the ALJ saw the dispositive question as "whether one needs it while standing or just walking[.]"  (R. 61).

Aronin next presented another hypothetical in which the individual is limited to unskilled work, requires a cane to ambulate, frequently lifting no more than five pounds, can sit for seven hours and stand for one hour daily, and can only occasionally bend, balance and crouch.  (R. 61–62).  Gagliano testified that "this RFC would be work preclusive at the competitive level."  (R. 62).  By contrast, if the hypothetical individual could lift up to ten pounds occasionally and five pounds frequently there would be available jobs.  (Id.)

ALJ Gaffaney did not make any findings at the conclusion of the hearing, consistent with his statement that he would await the missing psychiatric records.  (See R. 63–64).

On December 7, 2017, ALJ Gaffaney notified Lausell and her representative that they had failed to timely submit additional evidence in accordance with his instructions at the hearing, but granted an additional ten-day extension to submit additional evidence.  (R. 257).  On December 13, 2017, Lausell's attorney requested an additional fourteen days to obtain psychiatric records from Montefiore because of an issue with her signed release.  (R. 258).  The

record ultimately included psychiatric records from Dr. Motamedinia and Ms. Zilkha.  (R. 820–30).

### 2.    The ALJ's decision

On May 9, 2018, ALJ Gaffaney issued his Decision, finding that Lausell was not disabled under the applicable sections of the Social Security Act and accordingly denying SSI and DIB benefits.  (R. 13–28).

ALJ Gaffaney followed the five-step disability determination process.  As a preliminary matter, the ALJ found that Lausell met the insured status requirements for her DIB application through December 31, 2016, requiring her to establish disability "on or before that date in order to be entitled to a period of disability and disability insurance benefits."  (R. 13).  At step one, ALJ Gaffaney found that Lausell has not engaged in substantial gainful activity since January 1, 2015, her alleged onset date.  (R. 15).

At step two, the ALJ found that Ms. Lausell had seven severe impairments: obesity, bilateral knee degenerative joint disease status post-right knee TKA in June 2015, bilateral hip trochanteric bursitis, cervical degenerative disc disease, major depressive disorder, panic disorder and posttraumatic stress disorder.  (R. 15).  ALJ Gaffaney determined that each of these impairments significantly limit Lausell's ability to perform basic work activities.  (Id.)  By contrast, the ALJ determined that numerous conditions did not meet the standard.  (See R. 15–17).  Among these were positional vertigo, left tinnitus, headaches and low frequency hearing loss and possible Meniere's disease as well as osteoarthritis of the bilateral hips indicated in hospital discharge instructions but not corroborated by x-rays or diagnostic imaging (R. 15–17).  With respect to Lausell's vertigo, the ALJ noted that because of the inconsistency of treatment and

complaints, it did not amount to a severe impairment, and Lausell was provided with a sit/stand option, "which would account for any dizziness or vertigo." (R. 16).

At step three, the ALJ found that Lausell did not have an impairment or a combination of impairments that met or medically equaled the severity of one of the listed impairments in the Act. (R. 17). (The impairments listed in 20 CFR Appendix 1, Subpart P, Part 404 are known as the "Listings"). The ALJ found that the medical evidence did not meet or medically equal Listing 1.02, dysfunction of major joints, because "the record is devoid of evidence of an inability to perform fine and gross movements effectively or ambulate effectively." (R. 17–18). ALJ Gaffaney noted that there are no Listing criteria specific to the evaluation of obesity impairments but recognized that obesity shall be considered in conjunction with a claimant's impairments because "[o]besity may have an adverse impact upon co-existing impairments." (R. 18). For instance, ALJ Gaffaney suggested that "someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from arthritis alone . . . [and] obesity may limit an individual's ability to sustain activity on a regular and continuing basis during an eight-hour day . . ." (Id.)

In evaluating Lausell's mental impairment, ALJ Gaffaney explained that he first assessed whether the "paragraph B" criteria of Listings 12.04 covering depression or 12.06 concerning anxiety were met. (R. 18). To satisfy paragraph B, the mental impairment must result in at least one extreme or two marked limitations in a broad area of functioning (activities of daily living, social functioning, understanding, maintaining concentration, persistence, or pace). (Id.) ALJ Gaffaney found that Lausell had only mild or moderate limitations in the broad areas of functioning, and thus the paragraph B criteria were not satisfied. (R. 18–19). ALJ Gaffaney also

considered whether the "paragraph C" criteria of the Listings were satisfied, and concluded that the record does not demonstrate that Lausell has only marginal adjustment, as she had no psychiatric hospitalizations or emergency room visits since the alleged onset date and her psychiatric symptoms were stable with treatment.  (R. 19).

ALJ Gaffaney assessed Lausell's residual functional capacity as being able to perform light work with limitations, including "the use of a cane to ambulate."  (R. 20).  In pertinent part these limitations included sitting six hours and standing two hours in an eight-hour day, having a "sit/stand option," never kneeling, crouching, or crawling, and lifting or carrying at most twenty pounds occasionally and ten pounds frequently.  (Id.)  ALJ Gaffaney determined Lausell should be limited to simple, routine tasks with occasional change in a routine work setting and occasional interaction with the public.  (Id.)

In determining Lausell's RFC, ALJ Gaffaney reviewed and set forth Lausell's medical history including Dr. Blum's diagnosis and treatment primarily concerning her bilateral knee degenerative joint disease, the results of Dr. Long's physical consultative examination, back pain assessment and treatment by Drs. Levin, Kim and Singh, and medical treatment following a 2017 motor vehicle accident.  (R. 20–22).  ALJ Gaffaney concluded that Lausell's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record, and do not prove disability by a preponderance of the evidence."  (R. 23).  In sum, ALJ Gaffaney found that the medical record did not contain objective medical findings that corroborated Lausell's subjective complaints and supported further limitations to her RFC.  (Id.)  ALJ Gaffaney acknowledged Lausell's need for a cane and wrote, "I included the use of a cane to ambulate as the consultative

examiner indicated the cane appeared to be medically necessary and Dr. Blum 'discussed' the role of bracing and assistive devices (such as a cane or walker)." (Id.)

With respect to Lausell's right knee, ALJ Gaffaney found that her right knee arthroplasty "improved her symptoms." (R. 23). ALJ Gaffaney deemed unremarkable Lausell's physical examinations in the record, with the exception of reduced range of motion and tenderness to palpation in her bilateral knees, worse in the left knee, pain and crepitus with range of motion to the knees, reduced flexion and extension of the hips and lumbar spine, and some tenderness indicated to the hips. (R. 23–24).

With respect to opinion evidence concerning Lausell's physical limitations, ALJ Gaffaney gave "little weight" to Dr. Beauvais' findings because there were no treatment records from Dr. Beauvais in the record, so it was unclear how many times he saw Lausell and what type of testing he performed. (R. 25). To the contrary, ALJ Gaffaney found that Dr. Beauvais "merely checked off boxes on a form and did not provide a narrative report containing specific clinical findings . . ." (Id.) ALJ Gaffaney also deemed this opinion "less persuasive" because of Dr. Beauvais' background as an internist rather than an orthopedist. (Id.)

By contrast, ALJ Gaffaney accorded "some weight" to the conclusion of consultative examiner Dr. Carol McLean-Long, who, he noted, "completed specific testing to determine [Lausell's] physical limitations[,]" and who deemed medically necessary Lausell's reliance on a cane and opined that Lausell had mild limitations in her ability to sit and stand, among other things. (R. 25). However, ALJ Gaffaney found that Dr. McLean-Long's opinion was "vague and fails to provide any specific functional analysis as she does not defined [sic] 'mild limitation,' which renders the opinion less persuasive." (R. 26).

ALJ Gaffaney determined that Lausell's allegations of mental impairments "are given some weight" and he thus limited her to routine tasks with occasional change in routine work setting and occasional interaction with the public. (R. 25). ALJ Gaffaney accorded "great weight" to the opinion of mental consultative examiner Dr. Cope, whose mental consultative examination was the "only extensive mental status exam in the record[,]" and "appeared to be consistent with psychiatric problems, which might significantly interfere with [Lausell's] ability to function on a daily basis." (R. 26). Finally, ALJ Gaffaney gave "great weight" to the findings of agency specialist Lieber-Diaz, who opined that Lausell would be capable of simple work on a sustained basis. (Id.)

At step four, ALJ Gaffaney found Lausell did not have past relevant work. (R. 27). Finally, at step five, ALJ Gaffaney found that considering Lausell's age – 36 at the time of the alleged disability onset date – limited education, work experience and residual functional capacity, there are jobs that exist in the national economy that Lausell can perform, including as a final assembler (DOT 713.687-018), visual inspector (DOT 726.684-110), and sorter (DOT 521.687-086). (Id.)

### 3.   The Appeals Council decision

On July 2, 2018, Lausell filed written exceptions to the ALJ's decision and a request for Appeals Council review. (R. 176–79). By letter dated January 10, 2019, the Appeals Council found no reason to review the ALJ's decision and denied the request. (R. 1–5).

### 4.   The cross-motions

As noted above, the parties have cross moved for judgment on the pleadings. (ECF Nos. 16, 20). On December 21, 2020, the parties filed a joint letter that addressed the forthcoming expected decision by the Supreme Court in Carr v. Saul, No. 19-1442 and Davis v. Saul, No. 20-105 (see § III(C) infra), and in which Plaintiff requested, and Defendant did not oppose, that the

Court consider the merits of Lausell's non-constitutional challenges in this action without waiting for the Supreme Court's ruling. (ECF No. 26). The Court endorsed the parties' request. (ECF No. 27).

Lausell raises three arguments: (1) that the ALJ failed to properly weigh the medical opinion evidence; (2) that the ALJ failed to properly evaluate her subjective complaints; and (3) that the ALJ was not properly appointed under the Appointments Clause. (ECF No. 17). The Commissioner argues that the ALJ Decision is supported by substantial evidence and that Lausell's failure to exhaust the Appointments Clause at the administrative level resulted in a waiver. (ECF No. 21).

### III.   DISCUSSION

#### A.   Applicable Legal Standards

##### 1.   Standard of Review

Under Rule 12(c), a party is entitled to judgment on the pleadings if she establishes that no material facts are in dispute and that she is entitled to judgment as a matter of law. See Burnette v. Carothers, 192 F.3d 52, 56 (2d Cir. 1999); Morcelo v. Barnhart, No. 01 Civ. 743 (RCC) (FM), 2003 WL 470541, at *4 (S.D.N.Y. Jan. 21, 2003).

The Act provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A court may set aside the Commissioner's decision denying SSI benefits if it is not supported by substantial evidence or was based on legal error. Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009). Judicial review, therefore, involves two levels of inquiry. First, the Court must decide whether the ALJ applied the correct legal standard. Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Calvello v. Barnhart,

No. 05 Civ. 4254 (SCR) (MDF), 2008 WL 4452359, at *8 (S.D.N.Y. Apr. 29, 2008).  Second, the Court must decide whether the ALJ's decision was supported by substantial evidence.  (Id.)  "In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  Longbardi v. Astrue, No. 07 Civ. 5952 (LAP), 2009 WL 50140, at *21 (S.D.N.Y. Jan. 7, 2009).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008) (internal citations omitted).  The substantial evidence test applies not only to the factual findings, but also to the inferences and conclusions drawn from those facts.  See, e.g., Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 214 (S.D.N.Y. 1999).  In determining whether the administrative record contains evidence to support the denial of claims, the Court must consider the whole record, and weigh all evidence to ensure that the ALJ evaluated the claim fairly.  See, e.g., Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999).  The Commissioner, not the Court, resolves evidentiary conflicts and appraises the credibility of witnesses, including the claimant.  See, e.g., Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).

Disability-benefits proceedings are non-adversarial in nature, and therefore, the ALJ has an affirmative obligation to develop a complete administrative record, even when the claimant is represented by counsel.  See Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 508–09 (2d Cir. 2009).  To this end, the ALJ must make "every reasonable effort" to help an applicant get medical reports from her medical sources.  20 C.F.R. §§ 404.1512(b), 416.912(b).  Ultimately, "[t]he record as a whole must be complete and detailed enough to allow the ALJ to determine the claimant's

residual functional capacity."  Casino-Ortiz v. Astrue, No. 06 Civ. 155 (DAB) (JCF), 2007 WL 2745704, at *7 (S.D.N.Y. Sept. 21, 2007).  When there are inconsistencies, gaps, or ambiguities in the record, the regulations give the ALJ options to collect evidence to resolve these issues, including re-contacting the treating physician, requesting additional records, arranging for a consultative examination, or seeking information from others.  20 C.F.R. §§ 404.1520b, 416.920b.

The Act authorizes a court, when reviewing decisions of the SSA, to order further proceedings:  "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g); see Butts v. Barnhart, 388 F.3d 377, 382 (2d Cir. 2004).  If "'there are gaps in the administrative record or the ALJ has applied an improper legal standard,'" the court will remand the case for further development of the evidence or for more specific findings.  Rosa v. Callaghan, 168 F.3d at 72, 82–83 (2d Cir. 1999) (quoting Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)).  Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision. Pratts, 94 F.3d at 39.  If, however, the reviewing court concludes that an ALJ's determination to deny benefits was not supported by substantial evidence, a remand solely for calculation of benefits may be appropriate.  See, e.g., Butts, 388 F.3d at 386 (discussing Curry v. Apfel, 209 F.3d 117, 124 (2d Cir. 2000)).

      **2.**        **Standards for Benefits Eligibility**

For purposes of SSI and DIB benefits, one is "disabled" within the meaning of the Act, and thus entitled to such benefits, when she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected

to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(3)(A).  The Act also requires that the impairment be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(3)(B).  In reviewing a claim of disability, the Commissioner must consider:  "(1) objective medical facts; (2) diagnoses or medical opinions based on those facts; (3) subjective evidence of pain and disability testified to by claimant and other witnesses; and (4) the claimant's background, age, and experience." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 259 (2d Cir. 1988).

Under the applicable regulations, disability is evaluated under the sequential five-step process set forth in 20 C.F.R. § 404.1520(a)(4)(i)–(v) and 20 C.F.R. § 416.920(a)(4)(i)–(v).  The Second Circuit has described the process as follows:

> First, the Secretary considers whether the claimant is currently engaged in substantial gainful activity.  If not, the Secretary next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on the medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the Secretary will consider him disabled without considering vocational factors such as age, education, and work experience; the Secretary presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the Secretary then determines whether there is other work which the Claimant could perform.

Bush v. Shalala, 94 F. 3d 40, 44–45 (2d Cir. 1996) (quoting Rivera v. Schweiker, 717 F.2d 719, 722 (2d Cir. 1983)).

At the first four steps, the claimant bears the burden of proof.  At the fifth step, the burden shifts to the Commissioner to demonstrate that there are jobs in the national economy that the claimant can perform.  See, e.g., Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009).  In meeting the burden of proof at the fifth step, the Commissioner can usually rely on the Medical-Vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, known as "the Grid." Zorilla v. Chater, 915 F. Supp. 662, 666–67 (S.D.N.Y. 1996).

### 3.    Treating Physician Rule[8]

The SSA regulations require the ALJ to give "controlling weight" to "the opinion of a claimant's treating physician as to the nature and severity of the impairment . . . so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Burgess, 537 F.3d at 128 (internal citation omitted); accord Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Correale-Englehart v. Astrue, 687 F. Supp. 2d 396, 426 (S.D.N.Y. 2010).  "This preference is generally justified because treating sources are likely to be 'the medical professionals most able to provide a detailed, longitudinal picture' of a plaintiff's medical impairments and offer a unique perspective that the medical tests and SSA consultants are unable to obtain or communicate."

---

[8] The Court notes that "[i]n March 2017, the Social Security Administration published regulations that effectively abolished the Treating Physician Rule for claims filed on or after March 27, 2017." Dorta v. Saul, No. 19 Civ. 2215 (JGK) (RWL), 2020 WL 6269833, at *3 n.8 (S.D.N.Y. Oct. 26, 2020).  Under the new regulations the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a).

Correale-Engelhart, 687 F. Supp. 2d at 426 (quoting 20 C.F.R. § 416.927([c])(2)); see 20 C.F.R. § 404.1527.

If the ALJ determines that a treating physician's opinion is not controlling, he is nevertheless required to consider the following factors in determining the weight to be given to that opinion:  (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence provided to support the treating physician's opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is from a specialist; and (6) other factors brought to the Commissioner's attention that tend to support or contradict the opinion.  20 C.F.R. §§ 404.1527(c); 416.927(c). The ALJ must give "good reasons" for not crediting the plaintiff's treating physician.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) (explaining that Appeals Council had "an obligation to explain" the weight it gave to the opinions of the non-treating physicians).  After considering these factors, the ALJ must fully set forth his reasons for the weight assigned to the treating physician's opinion.  Burgess, 537 F.3d at 129.

While the ultimate issue of disability is reserved to the Commissioner, the regulations make clear that opinions from one-time examining sources that conflict with treating source opinions are generally given less weight.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  See also Selian v. Astrue, 708 F.3d 409, 419 (2d Cir. 2013) ("ALJs should not rely heavily on the findings of consultative physicians after a single examination."); Cabreja v. Colvin, No. 14 Civ. 4658 (VSB), 2015 WL 6503824, at *30 (S.D.N.Y. Oct. 27, 2015) (explaining that opinions of one-time consultants should not overrule those provided by the treating medical sources unless there are

"serious errors" in treating sources' opinions).   Failing to apply proper weight to a treating physician's opinion is reversible error.  Greek v. Colvin, 802 F.3d 370, 376 (2d Cir. 2015).

### 4.        Assessing claimant credibility

In considering a claimant's symptoms that allegedly limit his or her ability to work, the ALJ must first determine "whether there is an underlying medically determinable physical or mental impairment(s) —i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques — that could reasonably be expected to produce the claimant's pain or other symptoms." 20 C.F.R. §§ 404.1529(c), 416.929(c).  If such an impairment is found, the ALJ must next evaluate the "intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functional limitations."  20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).  To the extent that the claimant's expressed symptoms are not substantiated by the objective medical evidence, the ALJ must evaluate the claimant's credibility.  Meadors v. Astrue, 370 F. App'x 179, 183–84 (2d Cir. 2010); Taylor v. Barnhart, 83 F. App'x 347, 350–51 (2d Cir. 2003).

Courts have recognized that "the second stage of [the] analysis may itself involve two parts."  Sanchez v. Astrue, No. 07 Civ. 931 (DAB), 2010 WL 101501, at *14 (S.D.N.Y. Jan. 12, 2010). "First, the ALJ must decide whether objective evidence, on its own, substantiates the extent of the alleged symptoms (as opposed to the question in the first step of whether objective evidence establishes a condition that could 'reasonably be expected' to produce such symptoms)."  (Id.) "Second, if it does not, the ALJ must gauge a claimant's credibility regarding the alleged symptoms by reference to the seven factors listed [in 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3)]."

31

Id. (citing Gittens v. Astrue, No. 07 Civ. 1397 (GAY), 2008 WL 2787723, at *5 (S.D.N.Y. June 23, 2008)).  If the ALJ does not follow these steps, remand is appropriate.  Id. at *15.

When a claimant reports symptoms that are more severe than medical evidence alone would suggest, SSA regulations require the reviewing ALJ to consider specific factors in determining the credibility of the claimant's symptoms and their limiting effects.  SSR 96-7p, 1996 WL 374186, at *2 (superseded by SSR 16-3p for cases filed after March 27, 2017).  These seven factors include:  (1) an individual's daily activities; (2) the location, duration, frequency and intensity of pain or other symptoms; (3) factors that precipitate and aggravate those symptoms; (4) the type, dosage, effectiveness, and side effects of medication that the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, that the individual receives or has received for pain or other symptoms; (6) measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. See Bush, 94 F.3d at 46 n.4.

**B.    Evaluation of the ALJ's Decision**

The Court finds that the ALJ failed to adequately develop the record concerning Lausell's use of a cane as it relates to her ability to perform any work, even at a sedentary level, in light of the Vocational Expert's testimony.  In addition, remand for a further evidentiary hearing is appropriate because the ALJ failed to apply the proper legal standards in weighing Lausell's credibility and in finding that her statements concerning the intensity and limiting effects of her symptoms were inconsistent with the other record evidence.  However, the Court finds that the ALJ appropriately weighed and largely rejected the findings of Dr. Beauvais because there is no

indication that Dr. Beauvais had any treating relationship with Lausell and provided no support or explanation for his findings.

      1.      **Duty to develop the record**

          a.    **Ambiguity surrounding use of a cane**

The Vocational Expert's hearing testimony established that Lausell's heavy reliance on a cane was outcome-determinative of whether she could work.  In sum, based on the Vocational Expert's testimony, requiring a cane while standing would be preclusive to obtaining any work, while requiring a cane only to ambulate would not be.  (R. 60–61).  Despite this testimony, the ALJ failed to develop the evidence regarding whether Lausell would require a cane while standing up to two hours per daily work shift (R. 58) or only while ambulating, and the record is unresolved as to this critical issue.  Remand is therefore necessary to clarify this issue.

Lausell argues that the ALJ disregarded her unambiguous hearing testimony "that she uses a cane at all times when on her feet," which, she argues, was consistent with the medical evidence, including a consultative examiner's finding that the cane was medically necessary.  (ECF No. 17 at 21).  Accordingly, Lausell argues the ALJ's determination was not supported by substantial evidence.  (Id. at 20).

The Commissioner responds that the consultative examiner's conclusion was qualified by her notation that "Plaintiff 'walks' with a limp that 'decreases with the cane'" and therefore does not apply to standing at all times.  (ECF No. 21 at 24).  The Commissioner also points to a notation in Lausell's May 18, 2017 annual evaluation with Dr. Osman-Wager that she "has a cane (mostly for L knee) but embarrassed to use outdoors.  Does use it at home."  (R. 430).

The ALJ has an affirmative duty to develop the factual record.  Rosa, 168 F.3d at 79–80.  "This responsibility encompasses 'not only the duty to obtain a claimant's medical records and reports but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity.'"  Podolsky v. Colvin, No. 12 Civ. 6544 (RA) (JLC), 2013 WL 5372536 at *11 (S.D.N.Y. Sept. 26, 2013) (quoting Pena v. Astrue, No. 07 Civ. 11099 (GWG), 2008 WL 5111317 at *8 (S.D.N.Y. Dec. 3, 2008)).

Here, the Vocational Expert's testimony on this issue was as follows:

**Attorney**:    . . . so the same as hypothetical #1[9] with the sit/stand option, however, while standing, an individual [must] hold the cane with their dominant arm.  Presumably these jobs are eliminated?

**VE**:    That's correct.

[…]

**ALJ**:    Okay.  What, what if, what if we have the cane – use of a cane to ambulate?

**VE**:    If the cane is only needed to ambulate, those jobs would still be available.

**Attorney**:    Essentially it comes down to whether one needs it while standing or just walking, correct?

**VE**:    Correct.

(R. 60-61) (emphasis added).

The ALJ posed only one question to Lausell at the hearing concerning her use of a cane:

**ALJ**:    I see you have a cane with you today.

**Lausell**:    Yes.

**ALJ**:    Do you, do you use it all the time?

**Lausell**:    Yes.

---

[9] "Hypothetical #1" presented an individual age 36 at the disability onset with a limited education, no past relevant work, limited to lifting twenty pounds occasionally and ten pounds frequently, who would be standing two hours daily and seated six hours daily, limited to routine tasks with only occasional interaction with the public, and never kneeling, crouching or crawling.  (R. 58).

(R. 37–38).  Following this answer, there were no questions to clarify Lausell's response.  (See id.)

This is a particular lapse given that the record is replete with references to Lausell's use of a cane and to its medical necessity generally; absent is any clarification of the circumstances in which the cane is necessary.  As noted by the parties, Dr. Long, whose testimony ALJ Gaffaney accorded "some weight," and who, the ALJ recognized "completed specific testing to determine [Lausell's] physical limitations[,]" documented in her September 17, 2015 Internal Medicine Examination that "[t]he claimant has a cane which appears to be medically necessary[,]" and walks with a limp, although the limp is decreased with the cane.  (R. 25, 328).

Similarly, Dr. Blum documented in May 2015 that Lausell could walk only two blocks, assisted with a cane.  (R. 275).  In discussing with Lausell whether to undergo a right TKA, Dr. Blum noted that the use of an "assistive device" had not helped enough.  (R. 276).  On June 2, 2015, physical therapist Donnie Chan also noted that Lausell used a "standard cane" as an assistive device, had difficulty with her activities of daily living and was limited to ambulating "up to 1 block with SC."  (R. 294).

The record also includes evidence that Lausell experienced unsteadiness, imbalance, dizziness, and vertigo, which, although ALJ Gaffaney deemed them "not serious," when considered in connection with Lausell's other impairments, do bear on Lausell's functioning, and on their face, on her reliance on a cane to either stand or walk.  (R. 16); see Burgin v. Astrue, 348 Fed. Appx. 646, 647 (2d Cir. 2009) (quoting 20 C.F.R. § 404.1523) ("[Second Circuit] case law is plain that the combined effect of a claimant's impairments must be considered in determining disability; the [Commissioner] must evaluate their combined impact on a claimant's ability to work, regardless of whether every impairment is severe." (internal citations omitted)).  Among

these, in February 2016, Lausell complained to Dr. Diaz de Villalvilla of worsening two-to-three daily instances of "spinning" sensations "when changing positions (getting up, turning direction, bending over)" and he observed that her gait fell a little to the right side. (R. 349, 351). Likewise, in September 2017, Lausell was evaluated by Audiologist Hirschhorn who recommended further testing, and Dr. Gibber, who deemed her "highly suspicious" for Meniere's disease, "an inner-ear condition that can cause vertigo." (R. 774–75, 780; "Meniere's disease," WebMD, https://www.webmd.com/brain/what-is-meniere-disease (last visited Feb. 25, 2021)). Notably, these complaints of dizziness when getting up, and findings, call into question ALJ Gaffaney's conclusion that providing a "sit/stand option . . . along with providing postural and environmental limitations [] would account for any dizziness or vertigo." (R. 16).

The Court agrees with the Commissioner that Dr. Long's conclusion falls short of Lausell's suggestion that she "needs to use a cane at all times when on her feet." (ECF No. 17 at 21). But, the record does not support the Commissioner's argument that Dr. Long's conclusion applies only to ambulating (ECF No. 21 at 24), because in addition to Dr. Long's notations regarding Lausell's limping, Dr. Long also noted mild limitation to Lausell's abilities to sit and stand, as well as to walk, and documented that Lausell needed the assistance of the exam table to get on and off. (R. 328–29).

The Court finds that the ambiguity regarding cane use is also not resolved by Lausell's 2017 statement to Dr. Osman-Wager that she uses a cane at home but is embarrassed to use the cane outside of her apartment (R. 430), because the record indicates that during the period of Lausell's disability she has spent minimal time outside of the home. Lausell has not been employed in any capacity since 2014, prior to the period of disability (R. 57), her social life is

limited, and because of her anxiety concerning public transportation she regularly does not take her children to school, and instead walks them four blocks to the bus stop.  (R. 44–45, 52). Therefore, the record does not demonstrate that Lausell has engaged, or can engage, in activity comparable to standing for two hours on a work shift.

The ALJ had an independent duty to develop the record.  Lamay, 562 F.3d at 503, 508–09.  Although ALJ Gaffaney reviewed the medical and opinion evidence, and rendered a detailed decision, the ambiguity surrounding Lausell's use of a cane requires further development.  See Frazier v. Commissioner, No. 18 Civ. 7966 (SLC), 2020 WL 1503465 (S.D.N.Y. Mar. 30, 2020).  In Frazier, this Court remanded to the agency to resolve an ambiguous record concerning the claimant's gait and ability to walk without the assistance of a cane.  Frazier, 2020 WL 1503465 at *11–12.  While several doctors opined that a cane was medically necessary for Frazier, at least one found that her gait was normal; consequently, the ALJ determined that that she did not require a cane, and had the residual functional capacity to perform sedentary work with a sit/stand option.  (Id. at *4, 6, 11).  Therefore, the Court found that substantial evidence did not support the ALJ's conclusion surrounding Frazier's gait, or "[a]t the very least the status of her gait is ambiguous and the ALJ should collect evidence to resolve such ambiguity."  (Id. at *11) (citing 20 C.F.R. § 416.920b).  As in Frazier, there is record evidence that Lausell's cane is medically necessary, but further clarification is required.

In a similarly instructive scenario, in Cardoza v. Commissioner, the claimant "testified at his hearing that he used a cane 'all the time,' [] and the record [was] replete with instances of medical examiners noting [his] use of a cane" but the court ruled that remand was required because the Vocational Examiner's assessment did not account for his use of a cane.  353 F. Supp.

3d 267, 287–88 (S.D.N.Y. 2019).  The end result was the same as for Lausell, where the Vocational Examiner accounted for the cane in her hypothetical but the record was not adequately developed, such that the court could not "be assured that the [Vocational Expert] identified jobs that [the claimant] would be able to do."  (Id. at 288).

It will be essential to develop this evidence on remand and elicit testimony to clarify the nature of Lausell's use of a cane so that the Vocational Expert's guidance can appropriately be applied.

Following a full review of the record, the Court finds that the substantial evidence does not support the ALJ's implicit decision regarding Lausell's use of a cane; "at the very least" her need for a cane is ambiguous and the ALJ should develop the record at a further hearing to resolve that ambiguity.  20 C.F.R. §§ 404.1520b, 416.920b; Pena, 2008 WL 5111317 at *8. Accordingly, the ALJ's findings are not conclusive.  See 42 U.S.C. § 405(g) (the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive."); Longbardi, 2009 WL 50140, at *21 ("In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight.").

Accordingly, on remand, the ALJ should further develop the record related to Lausell's use of a cane and clarify the extent of her reliance on the cane for purposes of determining what, if any, work she could perform.

### 2. **Weight of the medical opinion evidence**

#### a. **Dr. Jacque Beauvais**

Lausell argues that the ALJ erred in finding that Dr. Beauvais was not a treating physician and in not giving Dr. Beauvais's conclusions controlling weight.  (ECF No. 17 at 17).  She argues that although Dr. Beauvais's signature was missing from her treatment records, nevertheless the ALJ should have considered Dr. Beauvais to be part of the same treatment team as her other providers, or at least further explored this possibility, because he too was affiliated with Montefiore Medical Center, where Lausell received her other medical treatment.  (Id. at 13). Lausell also argues that the ALJ should have further investigated the clinical or objective testing basis for Dr. Beauvais's conclusions.  (Id. at 14).  Lausell argues that the ALJ erred by giving greater weight to the "one-time examining internist, Dr. Long."  (Id. at 15).

The Commissioner responds that the ALJ appropriately determined that Dr. Beauvais's "check-the-box questionnaire identifying extreme physical limitations" was entitled to little weight. (ECF No. 21 at 25).  According to the Commissioner, the ALJ appropriately explained that there was a total absence of a documented treating relationship with Dr. Beauvais during the period of disability, Dr. Beauvais identified no support for his limitations, and the ALJ appropriately gave greater weight to consultative examiners whose findings were supported by substantial evidence.  (Id. at 25–29).

The absence of any treatment records from Dr. Beauvais supports the ALJ's decision to not accord his opinions with controlling weight.  The SSA regulations require the ALJ to give "controlling weight" to "the opinion of a claimant's treating physician as to the nature and severity of the impairment . . . so long as it is well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in

[the] case record." Burgess, 537 F.3d at 128 (internal citation omitted and emphasis added);

accord Green-Younger, 335 F.3d at 106; Correale-Englehart v. Astrue, 687 F. Supp. 2d 396, 426

(S.D.N.Y. 2010). "This preference is generally justified because treating sources are likely to be

'the medical professionals most able to provide a detailed, longitudinal picture' of a plaintiff's

medical impairments and offer a unique perspective that the medical tests and SSA consultants

are unable to obtain or communicate." Correale-Engelhart, 687 F. Supp. 2d at 426 (quoting 20

C.F.R. § 416.927(d)(2)).

The Court agrees that ALJ Gaffaney appropriately accorded "little weight" to the opinion

of Dr. Beauvais because

> there are no treatment records from Dr. Beauvais in the medical evidence of
> record so it is unclear how many times he had seen [Lausell] and what kind of
> testing he conducted. Dr. Beauvais merely checked off boxes on a form and did
> not provide a narrative report containing specific clinical findings to support [his
> findings] . . . except noting [Lausell] had diagnoses of obesity and osteoarthritis.

(R. 25).

Dr. Beauvais's documentation in the record consisted of a single two-page form checking

off limitations but devoid of any basis from which to determine its basis. (See R. 340–41). In fact,

in five places the form calls for the clinician to either "[i]nclude the medical/clinical findings that

support this assessment" or answer "[w]hat are the medical findings to support this assessment"

and Dr. Beauvais failed to answer every single one of these prompts, which were alongside his

asserted limitations to Lausell's: (1) performing postural activities; (2) performing manipulative

activities; (3) lifting and carrying; and (4) standing and walking. (Id.)

Dr. Beauvais's form is also deficient because it does not provide <u>any</u> information concerning the length of the treatment relationship (if any), the frequency of examination and the nature and extent of the treatment relationship.   20 C.F.R. §§ 404.1527(c), 416.927(c). Moreover, the form bore Dr. Villalvilla's name, with her name crossed out and Dr. Beauvais's name handwritten in, which, in conjunction with the absence of any other identified record bearing his name, sows further doubt as to whether Dr. Beauvais had any treating relationship with Lausell.  (R. 340).

Thus, the opinion of Dr. Beauvais was not "well-supported" by medically acceptable clinical and laboratory diagnostic techniques.  <u>Burgess</u>, 537 F.3d at 128.  Based on the lack of any medical treatment records underpinning Dr. Beauvais's opinion, and the unspecified nature of his treatment relationship with Lausell, ALJ Gaffaney did not err in affording his conclusions little weight.

### 3. Evaluation of subjective allegations

Lausell also contends that the ALJ did not properly evaluate her subjective allegations regarding her pain and physical limitations.  (ECF No. 17 at 19–21).  Specifically, Lausell argues that the ALJ erred by concluding that there are no clinical or objective findings in the record that could support a finding of disability, by failing to consider the combined limitations of all of Lausell's impairments, focusing on Lausell's improvements to her right knee and conservative treatment to her back and, as discussed supra (§ III(B)(1)(a)), disregarding Lausell's testimony concerning her use of a cane.  (<u>Id.</u>)

The Commissioner argues that the ALJ properly evaluated Lausell's allegations of her symptoms and resulting limitations, and the ALJ's RFC finding limiting Lausell to less-than-light

work with a sit-stand option tracked her testimony and abilities.  (ECF No. 21 at 21–24).  The Commissioner cites to Lausell's daily activities and Dr. McLean-Long's consultative opinion as evidence of her ability to meet the exertional demands of sedentary work with a sit-stand option. (Id. at 23–24).

Here, ALJ Gaffaney found that Lausell's statements "concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record, and do not prove disability by a preponderance of the evidence." (R. 23).  When a claimant reports symptoms that are more severe than medical evidence alone would suggest, the regulations require the ALJ to consider specific factors in determining the credibility of the claimant's symptoms and their limiting effects.  SSR 96-7p, 1996 WL 374186, at *2 (superseded by SSR 16-3p for cases filed after March 27, 2017).  These seven factors include: (1) an individual's daily activities; (2) the location, duration, frequency and intensity of pain or other symptoms; (3) factors that precipitate and aggravate those symptoms; (4) the type, dosage, effectiveness, and side effects of medication that the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, that the individual receives or has received for pain or other symptoms; (6) measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  See Bush, 94 F.3d at 46 n.4.  ALJ Gaffaney did not explicitly analyze these seven factors.

First, as discussed at length at (§ III(B)(1)(a)), Lausell's use of a cane was well-documented in the medical record and deemed medically necessary, and the record does not support the ALJ's inference that a cane was only necessary for ambulating.  (See R. 23) ("I included the use of a

42

cane to ambulate as the consultative examiner indicated the cane appeared to be medically necessary and Dr. Blum 'discussed' the role of bracing and assistive devices . . .'").

Second, ALJ Gaffaney appeared to ignore the cross-corroborating and longitudinal evidence of Lausell's persistent pain throughout the record.  Although there was noted improvement to her right knee following the right TKA, her severe degenerative joint disorder to the left knee was well-documented, uncontested, and appeared to worsen with time notwithstanding consistent treatment including repeated cortisone shots.  (See R. 347–48, 356, 372, 760, 799).  In this regard, the scope of Lausell's medical appointments and treatment is notable: she received orthopedic treatment including numerous visits and cortisone shots as well as a total right knee replacement from Dr. Blum (R. 267, 270–74, 347–48, 359, 372, 760, 799); pain management treatment to the sacroiliac joint was recommended by Dr. Kim, although Lausell did not follow through (R. 383, 739, 746); and an evaluation and diagnosis of her vertigo and dizziness by Dr. Gibber and Audiologist Hirschhorn.  (R. 774–75, 780).

Third, while the ALJ used Lausell's testimony concerning her daily activities as evidence that she can perform sedentary work with a sit-stand option, the testimony was insufficiently developed to be extrapolated to Lausell's ability to stand up to two hours per daily work shift to satisfy the Vocational Examiner's hypothetical.  (See R. 23, 58–63).

Thus, on remand, the ALJ must engage the required analysis for determining the credibility of a claimant's symptoms and their limiting effects as required by 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3).

## C.     Appointments Clause Challenge

Lausell argues that the ALJ Decision is invalid because the ALJ was not properly appointed at the time of the hearing and Decision as required by the Appointments Clause[10] and the Supreme Court's decision in Lucia v. S.E.C., __ U.S. __, 138 S. Ct. 2044 (June 21, 2018).  (ECF No. 17 at 21–26).  She notes that the issue may be moot if the Court remands this action for further proceedings, as the case will be presumably be heard by a properly appointed ALJ.  (Id. at 22).

The Commissioner counters that the Court should not consider the Appointments Clause challenge because Lausell never raised it during the agency process. (ECF No. 21 at 30–32).

The question whether Lausell was required to exhaust her Appointments Clause challenge at the agency level to preserve it for judicial review has been left open by the Supreme Court in Sims v. Apfel, 530 U.S. 103 (2000), and has not yet been addressed by the Second Circuit.  See Montes v. Saul, No. 19 Civ. 3039 (DF), 2020 WL 6875301, at *4 (S.D.N.Y. Nov. 23, 2020).  The Supreme Court is expected to address this question this term "as it has granted certiorari in two cases pending this precise question:  Carr v. Saul, No. 19-1442, 2020 WL 6551771 (Nov. 9, 2020) and Davis v. Saul, No. 20-105, 2020 WL 6551772 (Nov. 9, 2020)."  Velez v. Saul, No. No. 19 Civ. 7291 (LJL) (JLC), 2020 WL 7638246, at *3 (Dec. 23, 2020), aff'd 2021 WL 135700 (Jan. 14, 2021).

---

[10] The Appointments Clause provides that the President of the United States:

> [s]hall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. Art. II § 2, cl. 2.

The issue is also pending before the Second Circuit in Pichardo Suarez v. Berryhill, No. 20-1358 (2d Cir. (Appellant's Reply Br. filed Dec. 4, 2020)). Velez, 2020 WL 7638246 at *3.

Adopting the sound reasoning of several recent decisions in this District, the Court is of the view that Lausell was not required to raise her Appointments Clause challenge at the ALJ level to preserve it for judicial review. See Velez, 2020 WL 7638246, aff'd 2021 WL 135700 (Jan. 14, 2021); San Filippo v. Berryhill, No. 18 Civ. 10156 (VSB) (KNF), 2020 WL 62039 (S.D.N.Y. Jan. 3, 2020), aff'd 2020 WL 5229681 (Sept. 1, 2020); Montes, 2020 WL 6875301; Croston v. Saul, No. 19 Civ. 6151 (GBD) (JLC), 2020 WL 7756214 (S.D.N.Y. Dec. 30, 2020).

With guidance expected from the Supreme Court and the Second Circuit in the near term, it is unnecessary to rule on the Appointments Clause challenge until after the Supreme Court's decision on the consolidated appeals in Carr and Davis. See Velez, 2020 WL 7638246 (suggesting forbearance as an alternative to ruling on the Appointments Clause challenge) (citing Seife v. Food & Drug Admin., No. 17 Civ. 3960 (JMF), 2019 WL 1382724 at *2 (S.D.N.Y. Mar. 27, 2019); Holmes v. Artuz, No. 95 Civ. 2309 (SS), 1995 WL. 634995, at *1 (S.D.N.Y. Oct. 27, 1995) (Sotomayor, D.J.)). Furthermore, the Court's decision to remand Lausell's claims to the agency for further development effectively moots the Appointment Clause question altogether. See Vessia v. Saul, No. 2:16-CV-2865 (FB), 2019 WL 3553785 at *3 n. 4 (E.D.N.Y. Aug. 5, 2019).

## IV.   CONCLUSION

For the reasons set forth above, Lausell's motion for judgment on the pleadings (ECF No. 16) is GRANTED and the Commissioner's motion (ECF NO. 20) is DENIED. The Commissioner's decision denying benefits is vacated, and this matter is remanded to the agency for further proceedings.

The Clerk of Court is respectfully directed to close this case.

Dated:        New York, New York
              March 1, 2021

                                        SO ORDERED


                                        _____
                                        SARAH L. CAVE
                                        United States Magistrate Judge